UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JAMIE CAVANAGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 2:23-cv-00273-NT |
| | ) |
| IDEXX LABORATORIES, INC., | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION TO DISMISS**

Before me is a motion to dismiss Plaintiff Jamie Cavanagh's First Amended Complaint brought by Defendant IDEXX Laboratories, Inc. (ECF No. 11). For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**FACTUAL BACKGROUND**

Jamie Cavanagh began working for IDEXX Laboratories, Inc. ("**IDEXX**") in May 2011. Pl.'s First Am. Compl. ("**Compl.**") ¶ 10 (ECF No. 10). IDEXX specializes in veterinary diagnostics, software, and water microbiology testing. Compl. ¶ 4. Cavanagh worked primarily in the IDEXX human resources ("**HR**") department. Compl. ¶¶ 10–13. She was a dedicated and hardworking employee, and for much of her time with the company she received "Exceeded Expectations" performance ratings. Compl. ¶¶ 16–17. In May 2015, IDEXX promoted Cavanagh from a "grade 500" to "grade 600" position. Compl. ¶¶ 11–12. IDEXX promoted her again in March 2016, this time to a "grade 700" position. Compl. ¶ 12. The company identified her as a "high performer" with "high potential." Compl. ¶ 53.

In the fall of 2017, Cavanagh began reporting to Zach Nelson. Compl. ¶ 18. During that time, Cavanagh had interactions with a male colleague in her IDEXX client group that she viewed as "potentially flirtatious and distracting from her professional goals." Compl. ¶ 21. Other members of Cavanagh's team noticed these interactions and commented on them. Compl. ¶ 22. One team member suggested that Cavanagh ask to be moved to a different client group. Compl. ¶ 22. Cavanagh did not consider the interactions unwelcome or inappropriate, but she thought switching to a different client group would ensure that she maintained her professional reputation within the company. Compl. ¶ 24. Part of Cavanagh's motivation was that "she had witnessed other female IDEXX employees being stereotyped and discriminated against, and she wanted to avoid suffering the same fate." Compl. ¶ 27.

Cavanagh asked Nelson if she could move to a different client group. Compl. ¶ 25. This request was only to work with a different client group within her leader's portfolio, not to change jobs, job levels, managers, or duties. Compl. ¶ 23. Nelson responded by demanding details about the interactions between Cavanagh and the male colleague. Compl. ¶ 26. Cavanagh explained that she did not want to identify the male colleague or initiate an HR investigation, she just wanted to move to a different client group. Compl. ¶ 26.

Nelson failed to take action on Cavanagh's request to move to a different client group. Compl. ¶ 28. Instead, he gossiped about the request with other IDEXX employees who were outside her reporting chain and had no reason to know the information. Compl. ¶¶ 28–29. This gossip was harmful to Cavanagh's professional

2

reputation. Compl. ¶¶ 28, 30. By spreading this information unnecessarily, Nelson was trying to ruin Cavanagh's reputation with senior leaders, "significantly limiting her opportunities for advancement and merit increases at IDEXX." Compl. ¶ 30. This behavior was consistent with Cavanagh's view of Nelson's biases, namely that he "harbored extremely discriminatory attitudes about women who he deemed emotional, as well as women who stood up to him." Compl. ¶ 19. In her view, he would have handled this request differently if a male employee made a similar request. Compl. ¶ 31.[1]

Cavanagh made a formal complaint about Nelson's gossip campaign to employee relations. Compl. ¶ 34. This was "an explicit report of sex-based discrimination" by Nelson. Compl. ¶ 78. After that, his behavior towards Cavanagh got worse. Compl. ¶ 35. He gave her a negative performance evaluation, which included his view that she was "too emotional." Compl. ¶ 36. This review caused Cavanagh to receive a lower merit increase than she would have otherwise. Compl. ¶ 38. Nelson continued to badmouth Cavanagh and spread false information about her, including to IDEXX's senior leaders. Compl. ¶ 39. He began to "layer" Cavanagh under other HR professionals, so that she would have less visibility and opportunity for advancement. Compl. ¶ 40.

---

[1] In this factual background section, I have included allegations from the Complaint that, like this one, fall into the category of speculation, legal conclusions, labels, or recitations of the elements of a cause of action. Here, for example, Cavanagh does not identify an instance where Nelson handled a similar request from a male employee differently, she simply speculates that he would have. In the discussion section below, I address which allegations I consider and which I set aside, as they are relevant to the parties' legal arguments.

In April 2018, IDEXX promoted Cavanagh to a "grade 800" position. Compl. ¶ 13. Cavanagh earned this promotion despite Nelson's efforts to obstruct her advancement. For example, Nelson told IDEXX employee Gio Twigge that Cavanagh was overly emotional and bad at her job. Compl. ¶ 41. Twigge, like Nelson, had a reputation for "discriminating against and gaslighting women." Compl. ¶ 42. Twigge made Cavanagh interview and prepare presentations for all six partner leaders for the new role, just to be considered for an interview for the promotion. Compl. ¶ 44. Twigge did not require that similarly situated male employees take these sorts of predicate steps in order to interview or be considered for promotion. Compl. ¶ 45. Moreover, the requirement that Cavanagh interview at all for the promotion was unusual, as "IDEXX rarely requires internal candidates to interview for promotions within the natural progression of their career growth." Compl. ¶ 14. Female senior leaders within Cavanagh's organization had recommended her for promotion based on her strong work performance, but Nelson and Twigge ignored their feedback, "despite their superior experience and knowledge" of Cavanagh's work. Compl. ¶ 46.

From there, Cavanagh's career stalled out. Nelson encouraged IDEXX to place her in roles she did not want, in an effort to get her to resign. Compl. ¶¶ 47–48. In January 2020, she watched IDEXX promote equally or less qualified colleagues within her business unit. Compl. ¶ 49. Cavanagh did not advance because Nelson discouraged the company from promoting her any further. Compl. ¶ 49. Then in April 2020, Nelson gratuitously complained to others, including the CEO, about Cavanagh's performance on a project he had nothing to do with. Compl. ¶ 50. This

4

conduct further damaged her reputation and opportunity for advancement. Compl. ¶ 50. In November 2020, she once again watched similarly experienced and skilled colleagues receive "exorbitant three-grade-level promotions," while she received only a 4% raise. Compl. ¶ 52.

By late 2020, Nelson had succeeded in placing Cavanagh in a role she did not want. Compl. ¶ 55. While her counterparts were promoted, Cavanagh was repeatedly "layered" under an increasing number of managers, including one who was less qualified than Cavanagh. Compl. ¶¶ 54–55. Two of these managers, Jennifer Stickney and Katie Wellman, treated Cavanagh "in a cruel and demeaning manner." Compl. ¶ 57. Stickney berated Cavanagh for things she did not do and tasked her with work significantly below her pay grade, in violation of IDEXX's policies. Compl. ¶ 58.

The weight of these events over time caused Cavanagh to become severely depressed. Compl. ¶ 59. Moreover, Cavanagh is a survivor of domestic violence with a longstanding post-traumatic stress disorder ("**PTSD**") diagnosis. Compl. ¶ 60. Nelson and other managers at IDEXX knew about Cavanagh's diagnosis. Compl. ¶ 61.

On May 26, 2021, Stickney held "a hostile and abusive meeting" with Cavanagh. Compl. ¶ 65. Stickney designed this meeting to force Cavanagh out of IDEXX. Compl. ¶ 65. That same day, Stickney "failed to accommodate what she knew or reasonably should have known was a disability that Cavanagh suffered from." Compl. ¶ 66. On May 27, 2021, Cavanagh went out on a medical leave of absence.

Compl. ¶ 67. That same day, Cavanagh felt compelled to leave her job at IDEXX. Compl. ¶ 68.

Cavanagh filed complaints with the Equal Employment Opportunity Commission ("**EEOC**") and the Maine Human Rights Commission ("**MHRC**"). Compl. ¶ 6. She received right to sue letters on April 15, 2023 and October 10, 2023, respectively. Compl. ¶¶ 6–7. Cavanagh filed a Complaint in this Court on July 13, 2023, which she amended on November 28, 2023. Pl.'s Compl. and Demand for Jury Trial (ECF No. 1); *see* Compl. The Amended Complaint has four counts: (1) "sex-based discrimination in violation of Title VII"; (2) "opposing a practice made unlawful by Title VII"; (3) "disability discrimination under the ADA"; and (4) "violation of the Maine Human Rights Act." Compl. ¶¶ 70–95. IDEXX has moved to dismiss them all. Def.'s Mot. to Dismiss ("**MTD**") (ECF No. 11).

## LEGAL STANDARD

"To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), 'a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief, with enough factual detail to make the asserted claim plausible on its face.' " *Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 36 F.4th 29, 33 (1st Cir. 2022) (quoting *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015)). To evaluate whether a complaint meets this standard, I must "first, 'isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements,' then 'take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable

inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.' " *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (quoting *Zenon v. Guzman*, 924 F.3d 611, 615–16 (1st Cir. 2019)). In this process, I may employ my "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## DISCUSSION

IDEXX argues that Cavanagh's Complaint should be dismissed because the applicable statute of limitations bars her claims. IDEXX further contends that even if her claims were timely, Cavanagh has otherwise failed to state claims upon which relief may be granted. I take each argument in turn.

### I.   Administrative Exhaustion and Statute of Limitations

IDEXX's first line of argument is that Cavanagh's claims are time-barred because Cavanagh's administrative complaint was filed more than 300 days after the acts of discrimination alleged in the Complaint. MTD 6–9. An employee alleging discrimination must file an administrative complaint with the EEOC or parallel state agency before filing suit in court. *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 31 (1st Cir. 2009). Under Title VII, an aggrieved employee who files with a state agency must file the administrative complaint within 300 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); *see also Carey v. AB Car Rental Servs., Inc.*, 1:20-cv-00117-GZS, 2021 WL 431745, at *6 (D. Me. Feb. 8, 2021) (300-day period applies where litigant files with both EEOC and state agency). "[T]he timeliness requirement under 42 U.S.C. § 2000e-5(e)(1) is 'mandatory,' and failure to file within the time period means a potential plaintiff 'loses the ability to recover for

7

the alleged discrimination.' " *Frederique-Alexandre v. Dep't of Nat. & Env't Res. P.R.*, 478 F.3d 433, 437 (*quoting Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)).[2]

Determining when the discrimination "occurred" depends on the type of claim. In *National Railroad Passenger Corporation v. Morgan*, the United States Supreme Court differentiated between "discrete acts" of discrimination and hostile work environment claims. 536 U.S. at 114–15. Discrete acts, like a termination, denial of a promotion, or refusal to transfer are "easy to identify" and occur on a particular day. *Id.* at 110, 114. An employee with a discrimination claim based on, for example, the termination of her employment, will know that her employment was terminated and when it happened. But hostile work environment claims are different. By "[t]heir very nature," they typically "involve[ ] repeated conduct." *Id.* at 115. So unlike claims based on a discrete act, a hostile work environment claim may occur "over a series of days or perhaps years" and cannot be pinned to a particular day. *Id.* An employee subject to a series of lewd remarks, for example, may not know with certainty when the remarks cross the line from annoying to unlawful. Because of this difference, the deadline to file an administrative complaint is 300 days after "any act that is part of the hostile work environment" claim. *Id.* at 118. This concept is known as the "continuing violation doctrine." *See Franchina v. City of Providence*, 881 F.3d 32, 47 (1st Cir. 2018).

---

[2] Under the Maine Human Rights Act ("**MHRA**"), failure to administratively exhaust a complaint before filing in court limits a plaintiff's damages, but does not bar suit. 5 M.R.S. § 4622(1); *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 4 n.3, 157 A.3d 223.

Here, IDEXX maintains that based on when Cavanagh filed her administrative complaints, "only those allegations and events occurring on or after May 22, 2021 are properly before the Court." MTD 6. Cavanagh does not directly address this particular assertion. Instead, she asserts that her hostile work environment claims are timely under the continuing violation doctrine, Pl.'s Opp'n to Def.'s Mot. to Dismiss ("**Opp'n**") 11–13 (ECF No. 14), and that she has alleged an "ongoing, continuous adverse employment action up to and including May of 2021." Opp'n 15.

At this stage of the proceedings, dismissal is appropriate only "when the pleader's allegations 'leave no doubt that an asserted claim is time-barred.'" *Gorelik v. Costin*, 605 F.3d 118, 121 (1st Cir. 2010) (quoting *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998)). Here, although Cavanagh alleges that she received a notice of right to sue letter from the EEOC on April 15, 2023 and from the MHRC on October 10, 2023, she does not allege when she filed her administrative complaints. Compl. ¶¶ 6–7. For its part, IDEXX proffers conflicting dates. In its motion to dismiss, IDEXX asserts that Cavanagh filed her EEOC complaint "on or about March 22, 2022" and her MHRC complaint "on or about April 8, 2022." MTD 6. But then in its reply, IDEXX asserts that Cavanagh filed her EEOC and MHRC complaints on March 18, 2022. Def.'s Reply in Supp. of Mot. to Dismiss 4 n.5 (ECF No. 15).[3] Because the critical date is not alleged in Cavanagh's Complaint or any

---

[3] IDEXX did not attach the administrative complaints to its motion. If it had, I likely could have properly considered them on the motion to dismiss. *See Johnson v. Amherst Nursing Home, Inc.*, No. 14-30100-MGM, 2015 WL 4750932, at *3 n.3 (D. Mass. Aug. 11, 2015).

9

document that I can appropriately consider on a motion to dismiss, this issue cannot be decided at this time.

## II. Failure to State a Claim

I turn next to IDEXX's claim that Cavanagh's Complaint fails to state claims upon which relief can be granted. As noted above, Cavanagh's Complaint lists four counts: sex-based discrimination in violation of Title VII (Count I), retaliation in violation of Title VII (Count II), disability discrimination in violation of the Americans with Disabilities Act ("**ADA**") (Count III), and violation of unspecified sections of the Maine Human Rights Act ("**MHRA**") (Count IV). Compl. ¶¶ 70–95. Cavanagh appears to be pursuing multiple theories of liability within each count. For the sex discrimination and retaliation counts, she is pursuing a hostile work environment theory, as well as a discrete act disparate treatment theory. For the disability discrimination count, she is pursuing a failure to accommodate theory and seemingly also a discrete act disparate treatment theory.[4] And for the MHRA count,

---

[4] IDEXX proceeds as if Cavanagh is pursuing sex and disability-based hostile work environment theories of liability. *See, e.g.,* Def.'s Mot. to Dismiss ("**MTD**") 12 (ECF No. 11). Cavanagh clearly articulates a sex-based hostile work environment theory in her pleading. Compl. ¶ 2 ("This case challenges Defendant's . . . creation of a hostile and abusive work environment based on Plaintiff's gender."). I do not, however, read her Complaint as also articulating a disability-based hostile work environment claim. Nor does Cavanagh's opposition brief make any mention of a disability-based hostile work environment theory. Thus, to the extent Cavanagh meant to pursue a disability-based hostile work environment claim within Count III, it is dismissed. A closer question is whether the Complaint articulates a retaliatory hostile work environment theory of liability; meaning, retaliation against Cavanagh for speaking up about sex discrimination. *See generally Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 95–96 (1st Cir. 2018) (describing the contours of a retaliatory hostile work environment claim). IDEXX does not appear to read the Complaint as pursuing this theory, based on its treatment of Cavanagh's retaliation claim. MTD 21–22. However, the retaliation-based claim (Count II) does refer to a "continuing violation," Compl. ¶ 82, a term associated with hostile work environment claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). And Cavanagh's factual allegations do describe worsening treatment after she reported Nelson for sex-based discrimination. *See, e.g.,* Compl. ¶¶ 34–35, 39–41, 50, 78. I thus interpret the Complaint as alleging a retaliatory hostile work environment theory of liability.

I read her Complaint as pursuing parallel state law claims for the theories of liability in the first three counts.

I first analyze whether Cavanagh has stated sex or retaliation-based discrimination claims. Next, I turn to whether she has stated a disability discrimination claim.

### A. Discrimination on the Basis of Sex or Protected Conduct (Counts I, II, and IV)

I begin by addressing the Defendant's argument that Cavanagh has failed to state a hostile work environment claim. The elements of a hostile work environment claim are: (1) the plaintiff is a member of a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based upon her membership in that protected class; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) some basis for employer liability has been established. *Nieves-Borges v. El Conquistador P'ship, L.P., S.E.*, 936 F.3d 1, 8 (1st Cir. 2019).[5] "The point at which a work environment becomes hostile or abusive does not depend on any 'mathematically precise test.'" *Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). "[A]ll attendant circumstances" must be considered, "including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it

---

[5] The parties have not distinguished between the state and federal claims, so I follow suit and address them together.

11

unreasonably interfered with an employee's work performance." *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006). "[I]ncidents of nonsexual conduct—such as work sabotage, exclusion, denial of support, and humiliation—can in context contribute to a hostile work environment." *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001).

Here, Cavanagh has alleged that in her first five years with IDEXX, she established herself as a strong performer with high potential for advancement.[6] Her performance reviews and regular promotions reflected the strong reputation she had built. However, this changed when Nelson became her manager and she asked for his help navigating a potentially distracting workplace flirtation.

Instead of granting Cavanagh's modest request to switch client groups to avoid any appearance of a lack of professionalism, Nelson probed for details about Cavanagh's interactions with her male colleague. Cavanagh refused to discuss the potential flirtations, and Nelson did not let her switch client groups. Instead, he began gossiping about Cavanagh's request with IDEXX employees who had no reason to know the information, which was harmful to her professional standing within the company. Because of this harm, Cavanagh reported what she viewed as Nelson's sex-based discriminatory conduct to the employee relations people at IDEXX.

From there, Nelson's treatment of Cavanagh got worse. He continued to badmouth her, including to IDEXX's top management. This time, his campaign also

---

[6] This recitation includes Cavanagh's well-pled facts with inferences drawn in her favor, and excludes labels, conclusions, and cause of action elements. *See Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020).

included spreading false information about her. He gave Cavanagh a negative performance evaluation that described her as "too emotional," which meant she received a disproportionately low raise. Nelson began "layering" Cavanagh under other human resources professionals, so that her work and accomplishments were obscured and she would be unlikely to advance.

Nelson's campaign succeeded in souring other IDEXX employees' opinions of Cavanagh. Due to this souring, IDEXX made Cavanagh jump through hoops not required for her male colleagues when she sought a promotion. Nelson and another male employee disregarded positive feedback about Cavanagh when it came from senior female leaders. The campaign of negativity continued all the way up to IDEXX's CEO, to whom Nelson gratuitously complained about Cavanagh's performance on a project Nelson had nothing to do with. Cavanagh ended up buried under more and more managers, including one who gave her tasks below her pay grade and unfairly berated her. This treatment over a period of years caused Cavanagh to become depressed and take a medical leave of absence.

On these allegations, I find that Cavanagh has stated claims for both a retaliatory and sex-based hostile work environment. Importantly, because this is a motion to dismiss, I am necessarily evaluating an incomplete record. *See Bodman v. Me. Dept. of Health and Hum. Servs.*, 720 F. Supp. 2d 115, 121 (D. Me. 2010) (noting that Federal Rule of Civil Procedure 8(a)(2) simply requires "a short and plain statement of the claim showing that the pleader is entitled to relief," and explaining that plaintiffs need not prove their entire cases in their pleadings). For that reason,

the numerous summary judgment decisions IDEXX cites in its briefs are of limited use at this stage, since "the determination of whether an issue is trialworthy simply is not the same as the determination of whether a plaintiff states a claim upon which relief can be granted." *Id.*[7]

The record here plausibly alleges sustained mistreatment over a period of years—mistreatment that began by inappropriately sharing information related to Cavanagh's potential workplace romance, and intensified after she complained about sex-based mistreatment. This campaign of mistreatment included instances of professional sabotage and denials of support, including setting artificial barriers for Cavanagh (but not male employees) when she wanted to apply for a promotion. Moreover, Nelson's conduct soured Cavanagh's reputation throughout IDEXX, which caused others to mistreat her as well. This conduct interfered with her work, transforming Cavanagh from a high-potential employee to one whose career had stalled out. For present purposes, Cavanagh has plausibly alleged sustained mistreatment on the basis of sex and protected conduct. IDEXX's motion to dismiss her sex and retaliation-based hostile work environment claims is denied.

Because Cavanagh has plausibly alleged a theory of liability that survives the motion to dismiss under Counts I, II and IV, I need not decide whether her allegations of a constructive discharge (which are heavy on conclusions and light on specifics) are

---

[7] Moreover, my review of the few motion to dismiss cases in IDEXX's brief reveals that none resulted in dismissal of a hostile work environment claim. MTD 9–15 (citing *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220 (1st Cir. 2012); *Luka v. Bard Coll.*, 263 F. Supp. 3d 478 (S.D.N.Y. 2017); *Adkins v. Atria Senior Living, Inc.*, 113 F. Supp. 3d 399 (D. Me. 2012); *Bodman v. Me. Dept. of Health and Hum. Servs.*, 720 F. Supp. 2d 115 (D. Me. 2010)).

sufficient to state a claim. In any event, Cavanagh concedes that her constructive discharge theory does not form the basis for an independent claim, and for that reason, the issue does not need to be decided now. *See* Opp'n 17 (citing *Johnson v. Amherst Nursing Home, Inc.*, No. 14-30100-MGM, 2015 WL 4750932, at *7–8 (D. Mass. Aug. 11, 2015); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55–56 (1st Cir. 2012) (courts may properly consider concessions in a plaintiff's response on a motion to dismiss). Similarly, I do not reach whether other potential discrete adverse actions—such as the failure to promote in January 2020, disproportionately low raise in November 2020, or job placement in late 2020—form the basis for claims within Counts I, II, or IV.[8]

### B. Disability Discrimination – Count III

I next address IDEXX's argument that Cavanagh has failed to allege facts sufficient to state a claim for disability discrimination, and I begin with Cavanagh's failure to accommodate theory of liability. Under the ADA, an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). To establish a failure to accommodate claim, a plaintiff must demonstrate "that (1) she was disabled within the meaning of the ADA, (2) she was a qualified individual, and (3) the defendant, despite knowing of her disability, did not reasonably accommodate

---

[8] The administrative exhaustion and timeliness issues may ultimately resolve whether these claims are actionable or what relief may be available to Cavanagh.

15

it." *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 31 (1st Cir. 2019) (internal quotations omitted).

IDEXX challenges each element. Specifically, IDEXX argues that Cavanagh's allegations fail to "establish[ ]" (1) that she was disabled during her IDEXX employment, (2) that she "was unable (or able) to perform any essential functions of her job," or (3) that she requested or was denied an accommodation. MTD 21. As an initial matter, this is a Rule 12(b)(6) motion to dismiss, so Cavanagh does not have to "establish" the elements of her claim; she must simply plead facts that plausibly allege that she was subjected to illegal discrimination. *See Frith v. Whole Foods Market, Inc.*, 38 F.4th 263, 271 (1st Cir. 2022).

First, Cavanagh has plausibly alleged that she was disabled. "Major depressive disorder" is a specifically enumerated disability in the MHRA. 5 M.R.S. § 4553-A(1)(B). And Cavanagh alleges that "she became severely depressed" while working at IDEXX. Compl. ¶ 59. Moreover, she alleges that she had a longstanding diagnosis of PTSD. While she does not identify what "major life activities" this mental impairment "substantially limits," 42 U.S.C. § 12102(1)(A); 5 M.R.S. § 4553-A(1)(A)(1), or what "record" exists of her condition, 42 U.S.C. § 12102(1)(B); 5 M.R.S. § 4553-A(1)(C), using common sense, I can reasonably infer that PTSD and depression qualify as disabilities under the relevant statutes.

Second, Cavanagh has plausibly alleged that she was able to perform the essential functions of her job. During her ten years with the company, she earned three promotions and multiple "Exceeded Expectations" performance ratings. Compl.

16

¶¶ 11–13, 17. She alleges that her PTSD diagnosis was "longstanding." Compl. ¶ 60. From this I can infer that her promotions and strong performance evaluations occurred while she had this diagnosis. Thus, she has plausibly alleged that she was able to perform the essential functions of her job, with or without reasonable accommodation. *See Calero-Cerezo, U.S. Dep't of Just.*, 355 F.3d 6, 23 (1st Cir. 2004) (finding that employee's strong performance evaluation while managing major depression supported conclusion that she was able to perform the essential functions of her job).

IDEXX's third contention presents a closer question. Employers are required to make reasonable accommodations for "known" limitations. 42 U.S.C. § 12112(b)(5)(A). "Because an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an accommodation, the ADA's reasonable accommodation requirement usually does not apply unless" the employee makes a request. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001). An employee does not have to use any special words, but the request "must be specific enough that two things are clear to the employer: (1) the individual has a disability that is causing a work-related limitation; and (2) the individual believes an accommodation is needed in order to do the job." B. Lindemann & P. Grossman, *Employment Discrimination Law* ch. 13.VI.D.4 (7th ed. 2020); *see also* EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA, at Question 1 (Oct. 17, 2022), http://www.eeoc.gov/policy/docs/accommodation.html (last visited May 24, 2024).

17

While failure to accommodate claims thus typically start with a request from the employee, they do not have to. In situations where an "employee's disability may prevent the employee from requesting an accommodation" or "the employee's need for an accommodation [is] obvious" the employee may not have to make a specific request. *Reed*, 244 F.3d at 261 n.7; *see, e.g., Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) (disability of employee with diagnoses of paranoid schizophrenia and bipolar disorder called for employer to engage in additional communication "if it appear[ed] that the employee may need an accommodation but [didn't] know how to ask for it."); *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (disability of employee with cerebral palsy "obviously known to the employer," so employee did not have to make a specific request for an accommodation).

Here, Cavanagh alleges that Nelson and other IDEXX managers knew about her PTSD diagnosis. Compl. ¶¶ 60–61. She further alleges she went out on a medical leave of absence on May 27, 2021. Compl. ¶ 67.[9] She does not allege what, if any, specific accommodation she requested before or after her medical leave that IDEXX denied. Her theory must then be that it was obvious that her disability was causing a work-related limitation,[10] or that there was something about her PTSD or

---

[9] Cavanagh also alleges that "on May 26, 2021, Stickney failed to accommodate what she knew or reasonably should have known was a disability that Cavanagh suffered from." Compl. ¶ 66. This allegation is a recitation of a legal standard. Although it mentions a date and the person involved it does not tell what happened. I cannot plausibly infer from this statement what action Stickney took or did not take, what request Cavanagh made or did not make, what work-related limitation her disability caused, or what accommodation would have addressed that limitation.

[10] The Complaint includes: "IDEXX knew or reasonably should have known that Cavanagh suffered from a disability that required accommodation in order to perform the essential functions of

depression conditions that prevented her from making a specific request for accommodation. *See Reed*, 244 F.3d at 261 n.7. But her Complaint does not identify what work-related limitations her disabilities caused. Nor does it articulate what, if anything, about her particular condition prevented her from requesting an accommodation.

And, perhaps more fundamentally, her pleading does not identify what accommodation would have enabled her to perform which essential functions of her job. In other words, her Complaint is missing key facts about the accommodation she needed from IDEXX but did not get.[11] Due to these shortcomings, I agree with IDEXX that Cavanagh has failed to allege an actionable failure to accommodate claim.

That leaves Cavanagh's allegation that IDEXX's "stated reasons for changing the conditions of [her] employment were pretext for disability discrimination" and that at some point Nelson wrote that she was "too emotional" in a performance review. Compl. ¶¶ 36, 87. These allegations do not plausibly allege a claim for disparate treatment on the basis of disability. They are largely conclusory and do not impart sufficient factual information to meet the plausibility standard. Count III is therefore dismissed.

---

her job, which she would be able to do with reasonable accommodations." Compl. ¶ 64. But this is simply a recitation of the legal standard; it does not articulate any facts.

[11] As noted above, I can infer from the Complaint that she requested and received a leave of absence, a recognized type of reasonable accommodation. *See* 5 M.R.S. § 4553(9-A)(B); *Criado v. IBM Corp.*, 145 F.3d 437, 444–45 (1st Cir. 1998). Accordingly, the denied accommodation request must refer to something else. But, as noted above, the Complaint lacks any details about what other accommodation Cavanagh needed but did not get.

## CONCLUSION

For the reasons stated above, the Defendant's Motion to Dismiss (ECF No. 11) is **GRANTED IN PART** and **DENIED IN PART**. The Defendant's motion to dismiss is **DENIED** as to Count I (sex-based discrimination in violation of Title VII), Count II (opposing a practice made unlawful by Title VII), and Count IV (violation of the MHRA) and **GRANTED** as to Count III (disability discrimination under the ADA).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 28th day of May, 2024.